**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EDWIN ORTIZ, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| REYNALDO GUEVARA, AUBREY | ) | |
| O'QUINN, STEVEN GAWRYS, EDWARD | ) | |
| MINGEY, RALPH VUCKO, KRISTON | ) | |
| KATO, RICARDO ABREU, WILLIAM | ) | |
| ROONEY, RONALD REWERS, and the | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff Edwin Ortiz complains against defendants Reynaldo Guevara, Aubrey O'Quinn, Steven Gawrys, Edward Mingey, Ralph Vucko, Kriston Kato, Richard Abreu, William Rooney, Ronald Rewers, and the City of Chicago as follows:

### INTRODUCTION

1. Edwin Ortiz was only 16 years old when notorious Chicago Police officer Reynaldo Guevara and his co-conspirators at the Chicago Police Department framed Ortiz for a 1988 murder and shooting he did not commit.

2. Plaintiff was wrongly convicted in 1993, and he spent the next 30 years fighting to prove his innocence.

3. Not one piece of physical evidence ever connected Plaintiff to the crime, and the defendants had no reason to think he was responsible for it.

4. Instead, Plaintiff's arrest, prosecution, and conviction were based entirely on evidence the defendants manufactured, including false eyewitness identifications. Guevara even

paid one of the prosecution's witnesses to falsely identify Ortiz during the investigation.

5.      To ensure Plaintiff was wrongfully convicted, the defendants also hid evidence showing he was innocent.

6.      The horrors Plaintiff endured are not an anomaly: Plaintiff is one of at least 46 people exonerated after being convicted on murder charges arising from corrupt homicide investigations by Chicago Police officers, including Defendant Guevara, whom the Illinois Appellate Court has called "a malignant blight on the Chicago Police Department and the judicial system."

7.      More than three decades after Plaintiff's arrest, the criminal court vacated his conviction along with the murder convictions of seven other Guevara victims. That was the second time in less than two years the court exonerated seven or more Guevara victims at the same time.

8.      Plaintiff now seeks justice for the loss of his liberty and terrible hardship he endured and continues to suffer because of the defendants' misconduct.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action under 42 U.S.C. § 1983 and Illinois law to redress the defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

10.      This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

11.      Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

2

## PARTIES

12. Plaintiff Edwin Ortiz is an individual living in Chicago. He spent more than 20 years wrongfully imprisoned for a murder he did not commit, and he served another 14 years on supervised release.

13. At all relevant times, Defendants Reynaldo Guevara, Aubrey O'Quinn, Steven Gawrys, Ralph Vucko, Kriston Kato, Ricardo Abreu, Edward Mingey, William Rooney, and Ronald Rewers were officers at the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these defendants in his individual capacity.

14. The City of Chicago is an Illinois municipal corporation that employs or employed the above-named defendants. At all relevant times, each individual defendant acted as an agent or employee of the City.

## FACTS

### The Crime

15. Around 9:30 PM on July 31, 1988, Jose Morales, Santiago Pagan, and Marvin Taylor were hanging out in the entranceof an alley near Taylor's house in the Humboldt Park neighborhood of Chicago when a man approached.

16. The man mentioned someone named "Chino."

17. A moment later, he pulled out a gun and fired several shots at the friends before running down the alley.

18. Morales was shot in the chest; Taylor was hit in his right midsection; and Pagan was not hit.

19. Morales and Taylor were transported to the hospital by ambulance.

20. Morales was pronounced dead on arrival, but Taylor survived his injuries.

### The Initial Police Investigation

21. The Chicago Police Department responded to the scene of the crime.

22. Officers identified several eyewitnesses, at least four of whom were brought to the Area 4 police station.

23. Officers also collected physical evidence, including a stray bullet that had traveled through the front window of a house near the shooting and lodged in the wall; a cartridge casing found near a trash can in the alley; and a jacketed bullet recovered from Morales's body.

24. Detectives from the Area 4 Violent Crimes Division including Defendants Ralph Vucko, Kriston Kato, and Ricardo Abreu were assigned to the follow-up investigation.

25. Defendant sergeants William Rooney and Ronald Rewers supervised the detectives' work on the investigation.

26. Vucko and Kato interviewed Taylor at the hospital soon after the shooting. Taylor described the shooter as a white male, approximately 20 years old, with a light complexion and dark hair combed straight back.

27. Vucko and Kato then interviewed Pagan at the Area 4 police station. Pagan described the gunman as 18 to 20 years old, 5'6" to 5'7", approximately 120 lbs., with black hair, a light complexion, and a mustache.

28. Pagan also said the shooter was wearing a hooded sweatshirt with the hood over his head and blue corduroy pants.

29. Taylor stayed in the hospital for several months.

30. Shortly after his release, around September or October 1988, police officers went to Taylor's house to question him about the shooter again.

31. During that interview, officers gave Taylor fifteen books of suspect photographs and asked him to page through to see if he could identify his shooter. Taylor was not able to make any identifications from the pictures he saw.

32. With no leads, the investigation sat dormant for almost a year.

### Edwin Ortiz

33. At the time of the crime, Plaintiff was only fourteen years old.

34. Plaintiff was known by the nickname "Pee Wee" because, at that time, he was barely more than five feet tall.

35. He had nothing to do with the shooting.

36. In February 1989, Plaintiff had been arrested. After his arrest, officers added his photo to a collection of pictures of juveniles they kept in their files.

### Police Identify a Suspect a Year Later

37. On July 11, 1989, about a year after the shooting, two officers from the Chicago Police Department gang crimes unit visited Taylor to question him again about the gunman who shot him and killed Morales.

38. At that time, associates named "Chino" and Pedro A. were in police custody suspected of an unrelated murder. The gang crimes officers thought Pedro A., who was 19 years old, might be connected to the Morales murder since the suspect had mentioned "Chino" before shooting Taylor and Morales.

39. The officers showed Taylor an array of six photographs including a picture of Pedro A.

40. Taylor identified Pedro A. as his shooter.

41. Pedro A.'s age, height, weight, hair, and complexion all fit the descriptions Taylor

and Pagan had given of the man who shot at them.

42. Defendants Vucko and Kato wrote a report documenting Taylor's identification of Pedro A. from the photo array and stating they planned to conduct an in-person lineup.

43. Defendants created no further documentation reflecting their investigation into Pedro A.'s involvement in the crime. Alternatively, they created such documentation, but failed to disclose it to Plaintiff, his attorneys, or prosecutors in connection with Plaintiff's criminal prosecution.

**Defendant Guevara Enters the Investigation and Defendants Frame Ortiz**

44. In 1989, Defendants Guevara, Aubrey O'Quinn, and Steven Gawrys were officers in the Chicago Police Department's gang crimes unit under the supervision of Defendant sergeant Edward Mingey.

45. In the fall of 1989, for no apparent reason, Guevara, O'Quinn, and Gawrys inserted themselves into the Morales murder investigation.

46. On September 6, 1989, about five weeks after Taylor had identified Pedro A., Guevara and O'Quinn drove to Taylor's house to question Taylor again about the identity of his shooter.

47. Guevara and O'Quinn showed Taylor the book of photos in which police had included the February 1989 picture of Edwin Ortiz.

48. Guevara and O'Quinn knew Ortiz had nothing to do with the July 1988 shooting.

49. For one, Plaintiff—a short, thin juvenile, with a medium complexion—looked nothing like the shooter the victims described, or Pedro A., the suspect Taylor had previously identified from the photo array.

50. Moreover, no physical evidence connected him to the crime.

6

51.     Nevertheless, Guevara and O'Quinn coerced Taylor into falsely identifying Ortiz from the photo book.

52.     The same day, Defendants Guevara and O'Quinn wrote a report falsely claiming Taylor independently identified Ortiz as the gunman from looking at the photo book more than 13 months after the crime.

53.     Defendant Mingey approved the report knowing it was false.

54.     Defendants Vucko and Abreu also wrote a false report about the events at Taylor's house on September 6, 1989.

55.     Vucko and Abreu reported that Defendant O'Quinn showed Taylor photos including a picture of Plaintiff, and from those photos Taylor identified Plaintiff as the man who shot him.

56.     Defendant Rewers approved Vucko and Abreu's false report knowing it was false.

57.     Despite knowing Ortiz was innocent, Defendants seized upon Taylor's made-up identification and set out to manufacture a case against Ortiz.

58.     To that end, Defendants conspired to make up evidence undermining Taylor's earlier identification of Pedro A. as the shooter.

59.     The day after the photo array at Taylor's house, Defendants Vucko and Kato wrote a report claiming that weeks earlier, on July 27, 1989, Pedro A. had been brought to the police for an in-person lineup.

60.     The report falsely claimed that Taylor and Pagan saw Pedro A. in that lineup but failed to identify him as their shooter.

61.     Vucko and Kato's new report also falsely claimed that Taylor's earlier identification of Pedro A. in the photo lineup had been only "tentative."

7

62. Defendant Sergeant William Rooney approved Vucko and Kato's fabricated report knowing it was false.

63. With Pedro A. out of the picture, Defendants conspired to procure a false in-person identification of Plaintiff.

64. On September 29, 1989, Defendants arranged for Ortiz to be brought to the station for an in-person lineup.

65. Guevara picked up Pagan and Taylor from their homes to view the lineup.

66. Defendants Vucko and detective Ricardo Abreu conducted the lineup under Defendant sergeant Rewers' supervision.

67. Defendant Guevara stood by Pagan while Pagan viewed the lineup.

68. Pagan repeatedly told Defendants he could not identify anyone in the lineup as his shooter.

69. Nevertheless, Guevara pressured Pagan to choose Ortiz out of the lineup.

70. Among other tactics to procure a false identification, Guevara pointed to Ortiz and told Pagan he should pick Ortiz.

71. Pagan refused.

72. Guevara continued to pressure Pagan, ultimately offering to pay Pagan money in exchange for Pagan's agreement to falsely identify Plaintiff as the adult man who shot Taylor and killed Morales.

73. Guevara overcame Pagan's will. Pagan relented and agreed to identify Ortiz. In exchange, Guevara paid Pagan money.

74. On information and belief, Guevara used the same coercive tactics on Taylor as he used on Pagan. Through that coercion, Guevara manufactured Taylor's false identification of

Ortiz from the in-person lineup as well.

75. After procuring the false in-person identifications, Defendants fabricated a paper trail to conceal their misconduct and cloak their fabrications in a veil of legitimacy.

76. Defendants Vucko and Abreu wrote a report claiming that Taylor and Pagan positively identified Ortiz as the man who shot Taylor and killed Morales.

77. Vucko and Abreu's report also claimed Plaintiff's attorney was present during the lineup, concealing that Plaintiff's attorney was not present when Guevara offered to pay the witnesses for choosing Ortiz.

78. Defendant Rewers approved that report knowing it was false.

79. Separately, Defendants Guevara, O'Quinn, and Gawrys wrote their own false report claiming Taylor and Pagan picked Ortiz out of the in-person lineup.

80. Defendant Mingey approved the gang crimes officers' false report.

**Plaintiff's Wrongful Conviction and Imprisonment**

81. As a result of Defendants' misconduct and based on the false evidence they manufactured, Defendants arrested Plaintiff for murdering Morales and shooting Taylor.

82. There was no weapon or other physical or forensic evidence connecting Ortiz to the crime.

83. Nevertheless, Plaintiff was charged with murder and attempted murder.

84. At trial, the State's case hinged entirely on Taylor and Pagan's false and manufactured identifications of Plaintiff from the photos and later in-person lineup.

85. On May 3, 1993, a judge found Ortiz guilty of first-degree murder and attempted murder. The court sentenced Plaintiff to decades in prison.

86. Without the eyewitnesses' false identifications, Plaintiff never would have been

9

convicted.

87.     The following decades of Plaintiff's life were consumed by the horror of his wrongful imprisonment.

88.     Defendants' misconduct stole from Plaintiff what should have been the most formative time of his life: all his twenties and most of his thirties.

89.     When his life should have just been beginning, Plaintiff was instead locked in a prison with adult men, deprived of the chance to be cared for by his family, get an education, develop skills and a career, meet a life partner, start a family, and pursue his interests and passions.

90.     Indeed, Plaintiff was deprived of all the basic pleasures of human experience that free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

91.     Plaintiff never knew whether the truth would come out or whether he would be exonerated.

92.     Plaintiff's suffering did not end with his release from prison. Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**Plaintiff's Exoneration**

93.     Plaintiff steadfastly maintained his innocence before his conviction, after his trial, and after his release from prison.

94.     Plaintiff's post-trial motions and direct appeal all were unsuccessful.

95.     After 20 years behind bars for a crime he did not commit, Plaintiff was released

on parole in 2010. Plaintiff remained under supervision for the next 14 years.

96. Defendant Guevara testified under oath in various civil rights lawsuits in the years following Plaintiff's wrongful conviction. When asked during his testimony if he framed Plaintiff for the Morales murder and manipulated Taylor's identification, Guevara invoked his right to remain silent so as not to incriminate himself.

97. On February 28, 2024, as the extent of Guevara's rampant corruption was coming to light, Plaintiff filed a petition for relief from the criminal court's judgment and to vacate his conviction.

98. The State did not oppose the petition.

99. On July 25, 2024, Judge Kuriakos-Ciesil of the Cook County Circuit Court vacated Plaintiff's conviction. The State made a motion of nolle prosequi, and the Court dismissed all charges against him.

100. At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

**Chicago's Policy and Practice of Wrongly Convicting
Innocent People in Violation of the Constitution**

101. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like Plaintiff's case.

102. Since the 1980s, at least 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

103. In many of these cases, Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence,

concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

104.    At all relevant times, members of the Chicago Police Department, including Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew were inaccurate.

105.    At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

106.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

107.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10-cv-1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87-cv-2536 (N.D. Ill.), among others.

108.    The policies and practices of file suppression exposed in *Fields* were in place

from the 1980s through the 2000s, including at the time of the investigation at issue here.

109. In addition, a set of clandestine files related to Area 5 homicides—the same detective division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

110. The City of Chicago and the Chicago Police Department also routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City knew about this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

111. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases where Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

112. Before and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

113. For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Guevara and Miedzianowski worked

together in the CPD gang crimes unit before Guevara became homicide detective. Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski and to pressure drug dealers who did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

114.    In *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a verdict against the City, finding it responsible for maintaining both a code of silence and a deeply flawed disciplinary system. This system allowed Chicago police officers (operating out of the very same police facilities as Defendants in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

115.    The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among gang crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

116.    Leaders of the Chicago Police Department and elected officials in Chicago have acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the misconduct at issue in this case.

14

117. As a result of the City of Chicago's established practices, officers (including Defendants here) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

118. This belief extends to Defendants in this case. For example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear the City of Chicago and its police department would ever discipline them for doing so.

119. The City of Chicago and its police department also failed in the years before Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

    a. The conduct of live lineup, photographic, and other identification procedures.

    b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding.

    c. The need to refrain from physical and psychological abuse, and manipulative

and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

120. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

121. The City's failure to train, supervise, and discipline its officers, including the individual defendants in this case, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff.

122. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

123. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

**Defendant Guevara's History of Framing Innocent Persons**

124. As a result of the Chicago Police Department's policies and practices described

16

above, Defendant Guevara has framed dozens of innocent people over the span of two decades. These victims have lodged independent accusations of similar misconduct against Defendant Guevara.

125. As of the filing of this complaint, 46 people have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Oscar Soto, and Plaintiff Edwin Ortiz. These men and women served hundreds of years in prison for crimes they did not commit.

126. Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses, and using physical and psychological violence, all in the course of maliciously prosecuting innocent people.

127. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

17

128. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe the City of Chicago and its police department condoned his behavior.

129. Repeatedly, Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Guevara has refused, for example, to respond to allegations that he manipulated dozens of witnesses to provide false identifications; fabricated false evidence; suppressed exculpatory evidence, including documentary evidence; tortured and abused suspects and witnesses and coerced false statements from them; and committed the misconduct detailed below.

130. The following are examples of Defendant Guevara's misconduct:

a. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

b. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

c.  In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten on the head, face, and body until he confessed to murder and robbery. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until he confessed. The criminal court suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

d.  In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

e.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly punched Munoz in the mouth. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on and beat Munoz.

f.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Guevara denied the charges, but OPS found Guevara had lied about the incident and recommended Guevara be suspended for two days.

g.  In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him with their hands and flashlights.

h.      In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

i.      In 1988, Defendant Guevara, in concert with his partner Steve Gawrys, and under the supervision of Ed Mingey, caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was wrongfully convicted of the Valentin murder.

j.      Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed the victim, Valentin, identified Jacques Rivera as his shooter before he died. Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

k.      In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Guevara made Perez get inside his car, showed Perez a photo of Johnson, and told Perez he wanted Johnson to take the blame for the murder.

l.      In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which Ortiz later recanted.

20

m.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

n.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

o.  In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

p.  In 1990, Defendant Guevara paid two juvenile witnesses to falsely identify a suspect from a photo array in a shooting investigation, leading to the suspect's wrongful conviction.

q.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial, but Arcos was still wrongfully convicted.

r.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a

21

murder, though they later recanted citing Guevara's misconduct.

s.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for 50 years. Guevara then promised Rivera that if signed a statement, he could go home.

t.    In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. Guevara also manipulated and fabricated three other eyewitness identifications of Johnson as the shooter.

u.    In 1992, Defendant Guevara illegally prevented any adult or youth officer from being present while he interrogated juvenile Jacqueline Montanez. As a result, Montanez was wrongfully convicted of murder.

v.    In 1993, Defendant Guevara coerced Carl Richmond into falsely identifying Robert Bouto as the murderer of one of Richmond's friends.

w.    In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

x.    In 1993, Defendant Guevara used physical force and threats to coerce a false

22

confession from Adolfo Frias-Munoz. During the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face by Guevara, and beaten by two other officers. Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to falsely confess.

y.     In 1993, Defendant Guevara physically abused and threatened Francisco Vicente to coerce him into falsely implicating Geraldo Iglesias in a murder. Vicente later testified Guevara and other officers beat him, threatened him, and fed him facts to facilitate the false story.

z.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by beating him and telling him he could go home if he signed a statement.

aa.    In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses falsely identified Davila as the perpetrator.

bb.    In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not falsely identify Luis Serrano as the shooter, the Department of Children and Family Services would take away her children.

23

cc.     In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator knowing Figueroa did not see anything, causing Figueroa to be wrongfully convicted.

dd.     In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores. During Ortiz Bordoy's hours long interrogation, Guevara yelled in her face, swore at her, threatened that DCFS would take her children, and threatened to hit her.

ee.     In 1995, Defendant Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez as the perpetrator of a shooting.

ff.     In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Guevara as much. In addition, Guevara wrote false reports saying Melendez and another man identified a car as the one used in the shooting.

gg.     In 1995, Defendant Guevara coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a interview room and refusing his requests for an attorney. During the 11-hour interrogation, Guevara yelled at him, slapped him, and told him if he did not confess, he would never see the light of day.

hh.     In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

ii.     In 1996, Defendant Guevara framed Louis Robinson for murder after Robinson refused to pay Guevara protection money or falsely identify Guevara's chosen

24

suspect in a different crime. Guevara coerced an eyewitness into identifying Robinson from a photo array and a lineup and fabricated evidence that Robinson lied about his alibi.

jj. In 1997, Defendant Guevara coerced Robert Ruiz into falsely implicating Freddy and Concepcion Santiago for the murder of Guevarra's nephew. Guevara detained Ruiz repeatedly over a 10-day period, locking him in an interrogation room without food, water, or access to the bathroom. Guevara told Ruiz who to identify and what to say in his statement.

kk. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Guevara interrogated Dembski, a Polish national who did not speak English, without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

ll. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not.

mm. In 1997, Defendant Guevara coerced witnesses into identifying Oscar Soto from lineups in two separate murder investigations, even though witnesses had identified the true perpetrator of one of the crimes ten days earlier, before

Guevara was ever involved in the investigation.

nn.    In 1998, Defendant Guevara tried to extract a false confession from Rosauro Mejia by beating Mejia. Mejia never confessed and was finally released after being held in custody for three days.

oo.    In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her on the back of her neck while interrogating her.

pp.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

qq.    In 1998, Defendant Guevara beat Gabriel Solache while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

rr.    In 1999, Defendant Guevara and his colleagues used physical violence to coerce David Gecht into adopting a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

ss.    In addition, Guevara coerced Gecht's pregnant girlfriend, Colleen Miller, into falsely implicating Gecht in a shooting, telling her she would be arrested and her baby would be born in prison and taken from her if she did not cooperate.

tt.    In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial where Guevara was testifying and watched other witnesses' testimony. She told Guevara about the other witnesses' testimony before he took the stand, in

26

violation of a court order sequestering witnesses.

uu.     In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The FBI reported that Guevara, while acting as a police officer, solicited bribes from drug and gun dealers in exchange for the promise not to arrest them; took bribes to alter lineups of murder suspects; and took cash in exchange for dismissing murder cases he investigated.

vv.     In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup.

131.    Neither the City of Chicago nor the Chicago Police Department ever disciplined Defendant Guevara for any of the above misconduct.

132.    Indeed, Defendants engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department tolerated and condoned such conduct.

## COUNT I
### 42 U.S.C. § 1983 – Violation of Due Process
### (Fourteenth Amendment)

133.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

134.    As described above, Defendants while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

135.    In the manner described above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

27

136. Defendants knew this evidence was false.

137. Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

138. In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

139. In addition, on information and belief, Defendants concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

140. Defendants also procured supposed eyewitness identifications of Plaintiff, which they knew were false and unreliable, using unduly suggestive procedures, telling witnesses to identify Ortiz, and paying witnesses in exchange for falsely identifying Ortiz. Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

141. Defendants' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial. Absent Defendants' misconduct, Plaintiff's prosecution could not and would not have been pursued.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

143. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and

28

damages as set forth above.

144.     Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

145.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

146.     As described above, Defendants individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff. They did so without any probable cause and despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

147.     In so doing, Defendants maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

148.     The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

149.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

150.     Defendants undertook the misconduct described in this Count pursuant to the

policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

151. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

152. As described above, during the constitutional violations described in this complaint, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

153. Defendants had ample, reasonable opportunities and the duty to prevent this harm but failed to do so.

154. The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

155. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

156. The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

157. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

158. As described more fully above, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence, suppress evidence, and coerce identifications to detain, prosecute, and convict

Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

159.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

160.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

161.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

162.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

163.    Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT V**
**42 U.S.C. § 1983 – Municipal Liability Claim against the City of Chicago**

164.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

165.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

166.    At all relevant times, and for a period of time before and after Plaintiff's

31

wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

167.    At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

168.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals

32

were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training or knowledge of necessary safeguards against abusive conditions and involuntarily and/or false confessions; and (6) supervisors with knowledge of permissible interrogation techniques did not properly supervise or discipline officers and employees, causing coercive interrogations to continue unchecked.

169. In addition, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2) falsified witnesses' statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

170. These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like those affecting Plaintiff.

33

171. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

172. As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

173. Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

174. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

175. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

176. As described above, Defendants individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

177. In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. Those judicial proceedings were instituted

and continued maliciously, resulting in injury.

178.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in July 2024.

179.    The misconduct described in this Count was objectively unreasonable and Defendants undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

180.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

181.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

182.    Defendants' actions, omissions, and conduct described above were extreme and outrageous. Their actions were rooted in an abuse of power and authority. And Defendants undertook their actions intending to cause, or recklessly disregarding the probability their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

183.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Willful and Wanton Conduct

184.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

185.    At all times relevant to this complaint Defendants had a duty to refrain from willful and wanton conduct.

35

186.    Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

187.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Civil Conspiracy

188.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

189.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

190.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

191.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

192.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

193.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

36

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

194. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

195. While committing the misconduct alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

196. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim - Indemnification

197. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

198. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

199. The individual defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

200. Defendant City of Chicago is responsible to pay any judgment entered against the individual defendants.

WHEREFORE, Plaintiff Edwin Ortiz respectfully requests this Court enter a judgment in his favor and against Defendants Reynaldo Guevara, Aubrey O'Quinn, Edward Mingey, William Rooney, Ronald Rewers, Steven Gawrys, Ralph Vucko, Kriston Kato, Ricardo Abreu, and the City of Chicago awarding compensatory damages, attorneys' fees, and costs against each

defendant, punitive damages against each individual defendant, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Edwin Ortiz hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: October 28, 2024    Respectfully submitted

           EDWIN ORTIZ

           By: /s/ *Alison R. Leff*
              One of His Attorneys

           Jon Loevy
           Anand Swaminathan
           Steve Art
           Alison R. Leff
           LOEVY & LOEVY
           311 N Aberdeen St, 3rd Fl
           Chicago, IL 60607
           alison@loevy.com